IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACK JAY BROWN, | ) | 4:12CV3260 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Jack Jay Brown, brings this suit to challenge the Social Security Commissioner's final administrative decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1383f.[1] For the reasons discussed below, the Commissioner's decision will be reversed and the case will be remanded for further proceedings.

## I. PROCEDURAL BACKGROUND

Plaintiff is a 50-year-old man who has a high school education and experience working as a truck driver and laborer.  He last worked on December 1, 2008, and claims to be disabled because of back problems.

Plaintiff's applications for DIB and SSI were denied initially on April 1, 2010 (Transcript ("Tr.") (CM/ECF filing 13) 60). The applications were also denied on reconsideration, on August 11, 2010, with the Commissioner explaining:

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Titles II and XVI.

You said that you are unable to work because of back injury.

The medical evidence shows you do have a history of the above conditions and some of your activities are limited. The current review of the medical evidence shows your condition prevents you from performing heavy physical labor and repetitive bending/stooping. While your physical health does limit some of your activities the medical evidence shows you are able to move about and lift/carry lighter types of objects in a satisfactory manner with the above restrictions.

The medical evidence in reference to your mental health shows your mental health would not significantly limit your ability to perform work activities.

We realize your condition prevents you from doing your past jobs but it does [not] prevent you from doing other types of work that is lighter and less strenuous. Thus, we are still unable to show you meet the guidelines for receiving disability benefits at this time.

(Tr. 67).

Following these denials, Plaintiff filed a request for an administrative hearing (Tr. 78-79). Robert J. Burbank, an administrative law judge ("ALJ"), conducted a hearing by video teleconferencing on January 18, 2012 (Tr. 26-49). Plaintiff was represented by counsel and testified at the hearing. A vocational expert, James Adams, also provided testimony. The ALJ issued an unfavorable decision on February 9, 2012, concluding that although Plaintiff is unable to perform any past relevant work, he is not disabled. Using the 5-step sequential analysis prescribed by Social Security regulations,[2] the ALJ made the following findings:

---

[2]  The Eighth Circuit has described the procedure as follows:

At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third

**1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.**

**2. The claimant has not engaged in substantial gainful activity since December 1, 2008, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).**

**3. The claimant has the following severe impairment: degenerative disc disease/osteoarthritis (20 CFR 404.1520(c) and 416.920(c)).**

* * *

Additionally, a review of the medical record reflects the impairments of migraines (Exhibits 6F, pg. 6 and l0F, pg. 5); status-post kidney donation (Exhibits 4F and 6F, pg. 6); mood disorder and personality disorder (Exhibits 9F, pg. 1 and 11F, pg. 4). However, the claimant received a GAF of 60 upon discharge from the hospital in February 2010 and a GAF of 55 in March 2010 (Exhibits 9F, pg. 1 and 11F, pg. 5). Further, the medical record does not show a limitation in the claimant's ability to perform basic work activities due to these impairments and therefore, the undersigned finds that they are non-severe.

* * *

**4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the**

---

step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ("RFC")] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

**listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,404.1526, 416.920(d), 416.925 and 416.926).**

The claimant has a "severe" physical impairment within the meaning of the applicable regulations, but this impairment does not meet or medically equal any of the listed impairments including 1.04. The claimant does not allege that he has an impairment of listing level severity nor has he met his burden of presenting medical evidence that supports such a finding. The undersigned has reviewed the medical evidence of record in its entirety and finds that the claimant's impairment does not meet or equal the level of severity set forth in any of the listed impairments. The claimant's condition does not meet the requirements of Listing 1.04 because the claimant does not have evidence of nerve root compression, or spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.

**5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), in that the claimant can lift up to twenty pounds occasionally and lift or carry up to ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday; and sit for six hours out of an eight-hour workday. Further, the claimant is occasionally able to reach in all directions, climb, balance, stoop, kneel, crouch, and crawl, and should avoid concentrated exposure to vibrations and hazards.**

\* \* \*

On the amended alleged disability onset date, the claimant was a 45-year old man who asserts that he is unable to work due to a back injury and lumbar fractures (Exhibits 4E, pg. 1; 12E, pg. 2; and 24E). At the hearing, the claimant testified that his back pain started when he broke his back in 2002, his pain is currently an "8" or "9" on a scale of 1-10, it extends to his feet and hands, causes migraines and difficulties sleeping, and he was terminated from his prior job as a truck driver due to his pain. The claimant also testified that he lies down two to three times a day to alleviate his pain, he has difficulties moving his legs, his

-4-

legs tingle and have pressure, and he uses a cane for balance. Regarding his physical abilities, the claimant testified that he can stand for 5-15 minutes, walks every 30 minutes, sits for half the day, and that sitting is his most comfortable position, but he could not work a "desk job" because his back pain is too severe. Further, the claimant testified that he tries to walk for exercise, does some chores "as [he] can" including sweeping, washing the dishes, feeding the dogs and doing laundry. Previously, the claimant stated that he cooks, can drive for one and a half hours, sits and watches television, and can sit for two to three hours at one time with breaks, but is not able to do much due to pain (Exhibits 13E and 14E).

The undersigned finds that the claimant is limited to light exertional work, with the restrictions noted above, because of his impairment. Solely for historical perspective, the medical record reveals that the claimant suffered a spinal fracture and underwent an MRI in June 2002 that revealed degenerative disc disease without severe focal spinal stenosis or compression of the thoracic spinal cord as well as degenerative signal in the lumbar spine. An MRI of his cervical spine in August 2002 revealed only "very minor" disc bulging (Exhibits 1F and 2F, pgs. 7-9). That same month, x-rays of the claimant's lumbar spine revealed only "mild" degenerative changes (Exhibit 5F, pg. 53).

Subsequently, Timothy J. Birney, M.D., submitted a Worker's Compensation opinion in April 2003 that the claimant has a combined impairment of 14%, could work part-time at the medium exertional level, and work full-time at the light and sedentary exertional levels with alternating positions (Exhibit 5F, pgs. 61-64). Despite Dr. Birney's treating relationship with the claimant, the undersigned does not give his opinion controlling weight, but instead gives it partial weight because the medical record, including the objective imaging, indicates that the claimant is able to work full-time at both the light and sedentary exertional levels. However, Dr. Birney's opinion is remote in time, Social Security uses different standards for evaluating disability that [*sic*] Worker's Compensation, and whether an individual is disabled or able to work is an issue reserved for the Commissioner (20 CFR §§ 404.1527(e), 416.927(e); SSR 96-Sp, 61 Fed. Reg. at 34472).

Similarly, the claimant underwent a Functional Capacity Evaluation in March 2003 that opined he could work part-time at the medium exertional level, work full-time at the light and sedentary exertional levels, would benefit from alternating positions, and could occasionally sit, stand, walk, climb stairs utilizing bilateral handrails and should limit overhead reaching to a minimum (Exhibit 5F, pgs. 14-45). As with Dr. Birney's opinion, the undersigned gives these opinions partial weight because the medical record, including the objective imaging, shows that the claimant is able to work full-time at both the light and sedentary exertional levels. However, these opinions were rendered by non-acceptable medical sources, they are remote in time, Social Security uses different standards for evaluating disability that [*sic*] Worker's Compensation, and whether an individual is disabled or able to work is an issue reserved for the Commissioner (20 CFR §§ 404.1527(e), 416.927(e); SSR 96-Sp, 61 Fed. Reg. at 34472).

Several years later, the claimant presented for a medical consultative examination with Leland F. Lamberty M.D., in January 2007 who noted that he "seemed to be in discomfort during the examination, but there are little else in the way of findings." Dr. Lamberty determined that the claimant had chronic back pain and intermittent numbness and tingling in his left lower extremity, and opined that he should not repetitively lift, twist or bend and would have difficulty working as a truck driver, but could perform sedentary work (Exhibit 6F). The undersigned gives Dr. Lamberty's opinion little weight because he only examined the claimant one time and his opinion is remote in time, in that it was rendered nearly two years prior to the claimant's amended alleged onset date.

More recently, the claimant underwent another medical consultative examination with David Lindley, M.D., in March 2010. Dr. Lindley noted that x-rays of the claimant's lumbosacral spine revealed loss of lumbar lordosis with only "mild" muscle spasm, abnormalities of the L4 and L5 vertebral bodies, and sclerotic changes. After examination, Dr. Lindley diagnosed the claimant with osteoarthritis with an old injury at L4 and L5 as well as back pain, and opined that "he has not been deemed a candidate for surgery and is getting increasing disability related to this" (Exhibit l0F). The undersigned gives Dr. Lindley's opinion little weight because he only examined the claimant one time, it is inconsistent with the objective medical evidence that shows relatively benign findings, and

whether an individual is disabled is an issue reserved for the Commissioner (20 CFR §§ 404.1527(e), 416.927(e); SSR 96-Sp, 61 Fed. Reg. at 34472) (Exhibits 1F; 2F, pgs. 7-9; and 5F, pg. 53).

The State agency medical consultants opined that the claimant could perform work at the light exertional level with some postural, manipulative and environmental limitations (Exhibits 13F and 15F; see also Exhibit 7F rendered prior to the amended alleged onset date also opining to light exertional work). The undersigned gives the opinions of the State agency medical consultants' [*sic*] significant weight because they were rendered after a review of the medical record and the consultants are familiar with the definitions and evidentiary standards used by the Agency. Further, they are consistent with each other and the medical record including the objective imaging (Exhibits 1F; 2F, pgs. 7-9; and 5F, pg. 53).

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally not fully credible. The claimant is able to engage in a wide range of activities of daily living that could translate into performing a job including household chores such as sweeping, washing the dishes, feeding the dogs, and laundry. Therefore, the claimant is capable of performing basic work activities consistent with the residual functional capacity stated above.

While the medical record evidences that the claimant has degenerative disc disease/osteoarthritis, there is insufficient evidence in the record to support the level of limitation alleged by the claimant. On the contrary, there are few objective findings and what objective evidence does exist is relatively benign (Exhibits 1F; 2F, pgs. 7-9; and 5F, pg. 53). Further, the medical record indicates minimal treatment since his amended alleged onset date and gaps in treatment. While the claimant testified that he uses a cane for balance, there is no indication in the medical record that it was prescribed. Further, despite his allegations of severe pain, the claimant was in no apparent distress at the hearing and testified that he sits most of the day, which is his most comfortable position. Additionally, the claimant's migraines, status-post kidney donation,

-7-

mood disorder, and personality disorder were determined to be non-severe.

The undersigned further notes that the claimant testified that he has not received medical treatment because he is unable to afford it. However, the claimant also testified that he smokes cigarettes. Whether the claimant obtains cigarettes by buying them himself, borrowing money, or getting them from friends or family, his credibility is diminished because there is no indication that he has put as much energy or effort into finding alternative means to obtain medical treatment as he has put into obtaining cigarettes, despite his alleged lack of financial resources. The evidence does not document that the claimant was ever refused treatment or medication for any reason, including insufficient funds. Further, there is no persuasive evidence that the claimant ever sought the aid of any available public or private institution, program, or individual, to help defray the cost of treatment. Thus, the claimant's assertions that a lack of financial resources prevents his from getting treatment are unconvincing. If his impairments were truly as limiting and caused as much misery as the claimant has alleged, it seems that he would pursue regular medical care more diligently.

Accordingly, based upon the objective evidence, the claimant's course of treatment, his level of daily activity and his work history, the undersigned has determined that the claimant retains the residual functional capacity for work at the light exertional level due to his degenerative disc disease/osteoarthritis. Further, the claimant's degenerative disc disease/osteoarthritis causes limitations including occasionally being able to reach in all directions, climb, balance, stoop, kneel, crouch and crawl, and should avoid concentrated exposure to vibrations and hazards. Weighing all relevant factors, the undersigned finds that claimant's subjective complaints do not warrant any additional limitations beyond those established in the residual functional capacity previously outlined in this decision. This residual functional capacity is based on the entire medical record and adjusted to give the claimant the benefit of the doubt with regard to his allegations of disability.

**6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The vocational expert stated that the claimant has the following past work: laborer (DOT# 421.687-010, heavy, unskilled, SVP 2); laborer (DOT# 851.383-010, heavy, skilled, SVP 5); tire repairer (DOT# 915.684-010, heavy, semi-skilled, SVP 3); and semi-truck driver (DOT# 904.383-010, medium, semi-skilled, SVP 4) (Exhibit 25E).

In response to my questions that assumed the existence of a hypothetical individual of the claimant's age, education, past relevant work experience and residual functional capacity, the vocational expert testified that such an individual could not perform any of the claimant's past work. The undersigned accepts the vocational expert's testimony and finds that the claimant is not capable of performing his past relevant work

**7. The claimant . . . was 45 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

* * *

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to

which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as: order clerk (DOT# 209.567-014) a sedentary, unskilled position with 1,500 jobs available in Nebraska and 211,370 jobs available nationally; surveillance systems monitor (DOT# 379.367-010) a sedentary, unskilled position with 500 jobs available in Nebraska and 79,280 jobs available nationally; and charge-account clerk (DOT# 205.367-014) a sedentary, unskilled position with 1,500 jobs available in Nebraska and 204,730 jobs available nationally. Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(Tr. 13-20 (bold-face type and other emphasis in original)).

Plaintiff requested review of the ALJ's decision by the Appeals Council (Tr. 6). The request was denied on November 7, 2012 (Tr. 1-3). The ALJ's decision thereupon became the final decision of the Commissioner. *See Van Vickle v. Astrue,* 539 F.3d 825, 828 (8th Cir. 2008).

Plaintiff filed this action on December 28, 2012. The filing was timely under 42 U.S.C. § 405(g).

-10-

## II.  ISSUES

Plaintiff contends the ALJ erred by failing to (1) identify all of Plaintiff's "severe" impairments, (2) make a proper assessment of Plaintiff's credibility, (3) give appropriate weight to medical opinions, (4) make a proper RFC assessment, and (5) make a correct "step 5" disability determination.

## III. DISCUSSION

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).  " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted).  Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion.  *See id.* Questions of law, however, are reviewed de novo.  *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n. 2 (8th Cir. 1995).

### A. Plaintiff's Physical Impairments

The ALJ determined at step 2 of the sequential analysis that Plaintiff is severely impaired by "degenerative disc disease/osteoarthritis" (Tr. 13). No other "severe" physical impairments were found to exist.[3]  Plaintiff contends the ALJ committed

---

[3] "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)).  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.*

reversible error at step 2 by overlooking or ignoring a diagnosis of "[c]ongenital/ developmental cervical stenosis C3 to C6, with early symptoms of cervical myelopathy," that was made by Timothy J. Birney, M.D., in 2002 (Tr. 530).[4]

Dr. Birney, who is an orthopaedic surgeon, first saw Plaintiff on June 27, 2002 (Tr. 535-539). Plaintiff reported he started experiencing bilateral hand and forearm numbness, along with bilateral elbow pain, in August 2001 (Tr. 535). After suffering a work-related injury to his upper back in May 2002, Plaintiff also began noticing

---

[4] "Cervical stenosis is the narrowing of the spinal canal in the neck region and can occur from several causes, among them disc herniation and degenerative disc disease, or spondylosis. With advanced stenosis, nerve root and spinal cord compression can occur, with symptoms varying from mild to very serious.... When compression results in damage to the spinal cord, it is termed myelopathy." New York University Hospital for Joint Diseases Spine Center, "Patient Education, Neck and Arm Pain, Cervical Stenosis and Myelopathy," http://hjd.med.nyu.edu/spine/patient-education/spine-problems/neck-and-arm-pain/cervical-stenosis-and-myelopathy.

"Cervical spinal stenosis can develop from congenital pathology (the patient is born with a narrow spinal canal). This setting leaves the spinal cord vulnerable to compression from acquired degenerative disease processes or degenerative disease in which bony overgrowth and disc degeneration (herniation) further narrow the spinal canal over time." *Id.*

"Symptoms from cervical spinal stenosis without spinal cord compression are usually limited to neck pain and symptoms from nerve root compression. They include sensory changes of tingling, numbness, and paresthesias in the upper extremity. These symptoms can overlap with those of developing cervical myelopathy ... and can include a gradual progression of clumsiness, weakness, or numbness in the hands or fingers." *Id.*

"Dysfunction of the spinal cord is termed myelopathy. The dysfunction can result from many sources including cervical stenosis and herniated discs.... Regardless of the precise form of damage, the spinal cord responds in a characteristic way, producing weakness in the limbs (legs, or legs in combination with arms), tightness or spasticity of movement, altered sensation, and even incontinence." *Id.*

bilateral lower extremity numbness that would last for a few minutes each morning upon awakening (Tr. 535-536).

Upon examination, Dr. Birney found mild tenderness to palpation at C3-4 and from C5 to C7, but greater tenderness from palpation in the thoracic spine (Tr. 536). In the lumbar spine Plaintiff had mild tenderness to palpation at L5-S1 and nowhere else (Tr. 537). Dr. Birney viewed x-rays of Plaintiff's lumbar spine taken on June 13, 2002, which showed only mild degenerative changes (Tr. 579). He also reviewed the radiologist's report for MRIs that were performed on June 19, 2002. The report noted "[d]egenerative disc disease with multiple Schmorl's nodes throughout the thoracic spine, but without severe focal spinal stenosis or compression of the thoracic spinal cord" (Tr. 377). The report also noted "[a]nteriorly wedged morphology of the T12 and L1 vertebrae," which could be either developmental, related to the Schmorl's nodes, or degenerative (Tr. 378). There was "no evidence of lumbar spinal stenosis or compression of the lumbar nerve roots" (Tr. 378).

Dr. Birney's initial diagnostics impressions included: "1. Acute interscapular pain, secondary to work related blunt trauma .... 2. Probable bilateral carpal tunnel syndrome. 3. Transient morning diffuse bilateral lower extremity numbness, etiology unclear .... 4. Bilateral epicondylitis, work related" (Tr. 538). Dr. Birney told Plaintiff he had Scheuermann's disease of the thoracolumbar region, but stated "this really is not his symptomatic area" (Tr. 539). He prescribed physical therapy for this particular complaint (Tr. 539). He also recommended neurological testing to confirm the carpal tunnel syndrome and to attempt to find a reason for the morning numbness in both legs (Tr. 538).

On July 24, 2002, Dr. Birney reviewed the MRIs from June 19, 2002. In the thoracic spine MRI, Dr. Birney saw "evidence of congenital/developmental anterior wedging at the thoracolumbar junction, consistent with Scheuermann's kyphosis, along with diffuse Schmorl's node formation from the L1 level up to about the T5 region," but "no evidence of disc herniation or other sources of neural impingement"

-13-

(Tr. 533). Reviewing the MRI of Plaintiff's lumbosacral spine, Dr. Birney observed "evidence of loss of signal intensity at the L3-4, L4-5 and L5-S1 disc space levels" and "[c]entral annular bulging ... from L3 to the sacrum, but without stenosis or lateralizing nerve impingement" (Tr. 533).  He also noted "developmental anterior wedging ... at T12 and L1" but saw "no evidence of neural impingement" (Tr. 533).

Dr. Birney ordered an MRI of Plaintiff's cervical spine, which was performed on August 5, 2002.  The radiologist reported "[v]ery minor bulging of the discs at C3-C4 and at C5-C6 with minor flattening of the anterior wall of the thecal sac at these levels," but saw "no significant congenital spinal stenosis" and "[n]o other significant abnormality" (Tr. 379).  However, when Dr. Birney reviewed the MRI on August 21, 2002, he made the following observations:

> The patient's sagittal views show evidence of what appear to be mild broad disc protrusions at C3-4 and C5-6, in the context of an underlying congenital/developmental stenosis from C3 to C6, given that the patient has narrowing of the anterior and posterior subarachnoid spaces through those vertebral levels.
>
> On the patient's axial views, I see no evidence of neural impingement at C2-3. At C3-4, the patient appears to have a mild broad disc protrusion at the level of the disc space, but slightly below the level of the disc space there appears to be some degree of disc protrusion and posterior osteophytic ridging which in combination with a congenital/developmental stenosis, do result in a diminished AP canal dimension. His AP canal dimension there appears to measure almost 9 mm. At C4-5, there may be some mild posterior osteophytic ridging there, along with congenital/developmental stenosis that results in an AP canal dimension of about 10mm. At C5-6, the patient appears to have a broad disc protrusion with posterior osteophytic ridging that narrows both neural foramina and results in an AP canal dimension of about 9 mm. I see no evidence of neural impingement at C6-7 or at C7-T1.

(Tr. 532).

Dr. Birney then telephoned Plaintiff to explain the MRI findings.  His notes show the following discussion took place:

> I explained to him that in the context of a congenital/developmentally narrowed canal, even mild disc protrusions and posterior osteophytic ridging can result in spinal stenosis that could be the cause of his current upper extremity complaints He reminds me that he also gets numbness in both lower extremities. He wanted to know how to proceed. I explained to him that very little can be done to enlarge his spinal canal, although he certainly could pursue Physical Therapy (PT) measures once again. Perhaps an epidural steroid injection might be effective, although unpredictable. If he feels he is experiencing progressive neurologic deterioration over time, then of course there is always the option of anterior decompression and fusion from C3 to C6. He does not appear to be sufficiently symptomatic to warrant surgery of this magnitude.

(Tr. 532).

Plaintiff received two cervical epidural steroid injections, on September 24 and October 20, 2002 (Tr. 412, 424). When Plaintiff saw Dr. Birney again on October 30, 2002, he reported that the injections "have resulted in fairly dramatic relief of his pain complaints in the neck, upper back, and upper extremities, though he still gets intermittent numbness in both hands and both lower extremities" (Tr. 530). Plaintiff also related that "he has loss of maximal grip strength and some decrease in manual dexterity" and "occasional unsteadiness of gait" (Tr. 530). Plaintiff felt "he can 'live with' his current symptomatic level if it can be maintained" and indicated "he would prefer not to consider surgical intervention unless his clinical condition deteriorates further over time" (Tr. 530).

Dr. Birney saw Plaintiff for the last time on February 26, 2003, when it was determined that Plaintiff had reached maximum medical improvement for purposes of his workers' compensation claim (Tr. 528).  Plaintiff reported that the two cervical epidural steroid injections had "resulted in significant improvement in his sensation of upper and lower extremity numbness and weakness," but complained that he "still

-15-

has problems with persistent neck pain" and accompanying headaches (Tr. 528). It was recommended that Plaintiff see a neurologist to assess whether the headaches were cervically based and, if so, whether any medications would help (Tr. 528). Plaintiff does not appear to have followed this recommendation.

While the ALJ's decision does reference the August 2002 MRI of Plaintiff's cervical spine, the ALJ merely stated that the MRI "revealed only 'very minor' disc bulging" (Tr. 16), which was the radiologist's conclusion.[5] The ALJ made no mention of Dr. Birney's differing opinion that the MRI indicated cervical stenosis and that Plaintiff displayed early symptoms of cervical myelopathy.[6]

Although the ALJ did not reference Dr. Birney's diagnosis, the evidence does not prove that Plaintiff's cervical stenosis with myelopathy is a severe impairment.[7]

---

[5] The radiologist also opined that there was "no significant congenital spinal stenosis" (Tr. 379). Dr. Birney's notes reflect that he considered the cervical stenosis "significant" and consistent with Plaintiff's complaints of pain and numbness in his upper and lower extremities.

[6] Pertinent to Dr. Birney's diagnosis, Listing 1.04A requires a finding of disability for "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, *spinal stenosis*, *osteoarthritis*, *degenerative disc disease*, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A (emphasis supplied). The ALJ determined that "the claimant's condition does not meet the requirements of Listing 1.04[A] because the claimant does not have evidence of nerve root compression" (Tr. 15). Plaintiff, however, does not contend the ALJ should have made a finding of disability at step 3.

[7] Plaintiff also criticizes the ALJ's failure to discuss Dr. Birney's diagnosis of Scheuermann's disease, but concedes this condition is encompassed by the ALJ's finding that Plaintiff has "degenerative disc disease/osteoarthritis" (Tr. 13).

Dr. Birney noted that Plaintiff was not "sufficiently symptomatic to warrant surgery" (Tr. 532) and that two steroid injections had "resulted in significant improvement in his sensation of upper and lower extremity numbness and weakness" (Tr. 528).

### B. Medical Opinions

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) . "If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Otherwise, the weight given to a medical opinion depends upon (1) whether the source examined the claimant, and, if so, the frequency of examination; (2) whether the source treated the claimant, and, if so, the length, nature, and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other relevant factors.  See 20 C.F.R. §§ 404.1527(c), 416.927(c).  A decision that is not fully favorable "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id.; see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); Social Security Ruling 96-8p, 1996 WL 374184, *7 (S.S.A. July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

### 1. Dr. Birney

In the present case, the ALJ gave "partial weight" to an opinion of Dr. Birney that in April 2003 "the claimant ha[d] a combined impairment of 14%, could work part-time at the medium exertional level, and work full-time at the light and sedentary exertional levels with alternating positions (Exhibit 5F, pgs. 61-64)" (Tr. 16). The ALJ found the opinion of this treating physician to be inconsistent with "the medical record, including the objective imaging, [which] indicates that the claimant is able to work full-time at both the light and sedentary exertional levels" (Tr. 16). In other words, the ALJ found no evidence to support Dr. Birney's opinion that Plaintiff must be able to alternate positions while working.[8]

The ALJ's explanation is inadequate because it fails to identify any purported inconsistencies in the medical record, other than to reference "objective imaging." As discussed above, Dr. Birney's interpretation of the August 2002 MRI of Plaintiff's cervical spine differed significantly from the radiologist's.  The radiologist observed

---

[8] More precisely, Dr. Birney opined that Plaintiff "would also benefit from being able to able to alternate positions every thirty minutes as required for comfort" (Tr. 590). This opinion was provided in a report letter to a workers' compensation insurer, in which Dr. Birney stated that "[t]he patient is released to return to work with the restrictions as per his most recent Functional Capacities Evaluation" (Tr. 590). The functional capacities evaluation (FCE) was performed on March 3, 2003 (Tr. 540-571), less than a week after Plaintiff's final appointment with Dr. Birney . In the FCE report, the occupational therapist concluded that Plaintiff "demonstrates the ability to tolerate part-time job demands up to 4 hours per day within the medium work level category," "may be able to tolerate full-time job demands with the sedentary or light work category, and "may benefit from being able to alternate positions every 30 minutes to assist with pain management" (Tr. 570). In addition, as noted by the ALJ, the occupational therapist opined that Plaintiff "could occasionally sit, stand, walk, climb stairs utilizing bilateral handrails and should limit overhead reaching to a minimum (Exhibit 5F, pgs. 14-45)" (Tr. 16). "As with Dr. Birney's opinion, the [ALJ gave] these opinions partial weight because the medical record, including the objective imaging, shows that the claimant is able to work full-time at both the light and sedentary exertional levels" (Tr. 16).

only "very minor" disc bulging and "no significant congenital spinal stenosis" (Tr. 379), but Dr. Birney saw narrowing of Plaintiff's spinal canal which "could be the cause of his current upper extremity complaints ... [and] numbness in both lower extremities" (Tr. 532).

"[T]he ALJ is not free to ignore medical evidence but rather must consider the whole record." *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000). "An ALJ's failure to cite specific evidence does not indicate that it was not considered," *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000), but "[i]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). In this instance, the ALJ either overlooked Dr. Birney's opinion concerning the cervical MRI or else neglected his duty to provide "good reasons" for not accepting Dr. Birney's opinion. Whichever was the case here, the ALJ committed reversible error.

The ALJ further explained that he did not give controlling weight to Dr. Birney's opinion because it "is remote in time, Social Security uses different standards for evaluating disability that Worker's Compensation, and whether an individual is disabled or able to work is an issue reserved for the Commissioner" (Tr. 16).[9] These are valid considerations.[10] *See, e.g., Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997) (ALJ properly discounted treating physician's opinion that was several years

---

[9] The ALJ gave the same reasons for discounting the FCE report and also noted that occupational therapists are "non-acceptable medical sources" (Tr. 16-17).

[10] However, the "remoteness" factor cannot negate Dr. Birney's diagnosis of cervical stenosis with myelopathy because this is not a medical condition that heals itself. "The natural history of cervical stenosis and cervical myelopathy is that of a progressive disease which eventually may lead to severe disabilities if left untreated." New York University Hospital for Joint Diseases Spine Center, "Patient Education, Neck and Arm Pain, Cervical Stenosis and Myelopathy," http://hjd.med.nyu.edu/spine/patient-education/spine-problems/neck-and-arm-pain/cervical-stenosis-and-myelopathy.

removed from the time period relevant to claimant's Social Security application); *Loeffler v. Massanari*, 23 Fed.Appx. 605, 606, 2001 WL 1426581, *1 (8th Cir. 2001) (claimant's reliance on doctors' statements related to her workers' compensation claim was misplaced because disability determination by another agency is not binding on the Social Security Administration) (citing 20 C.F.R. §§ 404.1504, 416.904); 20 C.F.R. §§ 404.1527(d), 416.927(d) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

### 2. Dr. Lamberty

Leland F. Lamberty, M.D., examined Plaintiff in January 2007 in connection with an earlier application for disability benefits. It is stated in the ALJ's decision that Dr. Lamberty "opined that he should not repetitively lift, twist or bend and would have difficulty working as a truck driver, but could perform sedentary work (Exhibit 6F)" (Tr. 17).[11]  The ALJ gave this opinion "little weight because he only examined

---

[11] On examination, Dr. Lamberty found no motor or sensory deficits (Tr. 596). Plaintiff's reflexes were " 3+ and equal in the lower extremities" (Tr. 596). It was also reported that

> X-rays of the claimant brought with him taken back in 2002 showed some anterior narrowing of T12 and Ll and other than that nothing terribly unusual noted. The MRI reports of all three areas of the spine were noted with no evidence of severe focal spinal stenosis or compression of thoracic or lumbar cord. Minor degenerative changes were noted.

(Tr. 596).

Dr. Lamberty's impressions were:

1.    Chronic back pain worse, midthoracic and lumbar spine secondary to injury of 05/02.
2.    Intermittent numbness and tingling, left lower extremity.

the claimant one time and his opinion is remote in time, in that it was rendered nearly two years prior to the claimant's amended alleged onset date" (Tr. 17).

"The opinion of a consulting physician who examines a claimant once ... does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).[12] This does not necessarily mean, however, that Dr. Lamberty's

_____

    3.     Decreased strength both hands with decrease in manual dexterity.

    4.     Migraine headaches secondary to back injury.

    5.     Status post kidney donation.

(Tr. 596).

Dr. Lamberty's consultative examination report concluded:

This gentleman certainly seemed to be in discomfort during the examination, but there are little else in the way of findings. He was able to walk on his toes or his heels with a little bit of difficulty, but still accomplished it. There was certainly no localization as far as muscle weakness or wasting. It is certainly possible that the pain he is having is secondary to his injury with little findings in the way of physical exam or imaging at least from 2002. He certainly, at this point in time, would be no candidate to do any kind of repetitive lifting, twisting, bending at the waist, and because of the intermittent numbness of the left lower extremity it would certainly make it difficult for him to work as a truck driver since he would have difficulty managing the clutch pedal. Sedentary-type work would certainly be within his grasp, as mentally he does seem to be reasonably sharp and motivated.

(Tr. 596-597).

   [12] "Nonetheless, there are two exceptions to this general rule. *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). "Specifically, [the court] will uphold the ALJ's decision to credit a one-time consultant and discount a treating physician's opinion '(1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id.* at 812-13

opinion carries only "little" weight.  Also, the ALJ gave no weight to Dr. Lamberty's opinion that Plaintiff should not repetitively lift, twist or bend.  There may be good reasons for this decision—possibly including the "remoteness" factor—but the ALJ's explanation was again inadequate.

### 3. Dr. Lindley

Another consultative physician, David Lindley, M.D., examined Plaintiff in March 2010[13] and, as noted by the ALJ, "opined that 'he has not been deemed a

_____

(quoting *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)).  In this instance, Dr. Lamberty did not review the actual MRI results, but instead relied on the radiologist's reports.  His opinion therefore cannot be used to discredit Dr. Birney's interpretation of the cervical MRI results.

[13] Plaintiff told Dr. Lindley he

had a Workmen's Comp injury where he fell and knocked pretty significantly his back as he was pulling on some heavy equipment and lost balance and he apparently ruptured a disk in his lower back. He was told he was not a candidate for surgery due to severe spinal stenosis. Unfortunately, his pains have gradually gotten worse. He has gone to work until about a year ago, but now he just cannot do anything any longer. He is in constant pain in his lower back all the way up into his thoracic spine up into his occiput of his head, aching all around his head and he gets horrible headaches....

He also gets pain shooting down his arms, worse in the left than the right arm with a tingling in his hands and weakness in his hands and occasionally he drops things. He also gets pain shooting down his legs. He gets tingling in his lower legs and in his feet intermittently. He tries not to bend or lift. Laying in bed, he can only do this for two to three hours. He can stand for about five minutes, can sit for half an hour and he can walk around for about five minutes using a cane and then has to sit down due to increasing severe pains in his back .

(Tr. 631-632).

candidate for surgery and is getting increasing disability related to this [osteoarthritis with an old injury at L4 and L5 as well as back pain] (Exhibit l0F)'" (Tr. 17).  The ALJ also gave this opinion "little weight" because Dr. Lindley "only examined the

---

Dr. Lindley observed that Plaintiff "obviously ... has problems getting around the exam room and has his cane with him and uses it even just in the exam room" (Tr. 633).  On examination, Dr. Lindley found that Plaintiff

> [h]as obvious muscle spasm in the thoracic and paralumbar muscles with severe tenderness in the parathoracic muscles, a little bit tenderness in the paralumbar muscles. He has reduced range of motion of the spine. He also has reduced range of motion on lifting the right and the left arm, both arms to get above shoulder height is hard or behind his back and reduced straight leg raising again with pain shooting down his legs from his back.

> Cranial nerves II through XII intact. Normal peripheral nervous system. Tone, power, muscle coordination, and sensation were intact. Reflexes are normal. Downward going plantars.

> X-rays taken of the lumbosacral spine showed some clips from the removal of his right kidney, showed loss of lumbar lordosis with mild muscle spasm. Disk spaces looked pretty well preserved. He has significant abnormality to the L4 and the L5 vertebral bodies with some old vertebral body fractures there. He has some sclerotic changes to the vertebral bodies.

(Tr. 634-635). Dr. Lindley's overall impressions were:

l.     Muscle spasm and osteoarthritis with probably old injury in L4 and L5, possible vertebral fractures that are healed.
2.     Severe back pain.
3.     Headaches, probably radiating from the back pain.
4.     Neuropathic symptoms, variable, sometimes to the stage of even paralyzing him, stopping him walking around, hardly much _____ particularly on his left leg.

(Tr. 635 (blank in original)).

-23-

claimant one time, it is inconsistent with the objective medical evidence that shows relatively benign findings, and whether an individual is disabled is an issue reserved for the Commissioner" (Tr. 17).

Dr. Lindley is the only doctor to examine Plaintiff since the alleged disability onset date, but he failed to provide a medical opinion about Plaintiff's functional limitations. Instead, he concluded his report by stating only that Plaintiff "appears to have struggled with his back for sometime [*sic*]" but "has not been deemed a candidate for surgery and is getting increasing disability related to this" (Tr. 635). It was proper for the ALJ to disregard Dr. Lindley's conclusory opinion about Plaintiff's "increasing disability." *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' ... involves an issue reserved for the Commissioner ..."). However, "[t]he ALJ has a duty to fully and fairly develop the evidentiary record," *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012), and "should recontact a treating or consulting physician if a critical issue is undeveloped." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010).

Also, the ALJ made no mention of the fact that Dr. Lindley took x-rays of Plaintiff's lumbosacral spine and noted "significant abnormality to the L4 and the L5 vertebral bodies" and "some sclerotic changes to the vertebral bodies" (Tr. 635). The x-rays of Plaintiff's lumbar spine that were taken eight years earlier revealed only mild degenerative changes (Tr. 579). In this circumstance, the ALJ could not dismiss Dr. Lindley's opinion as being "inconsistent with the objective medical evidence that shows relatively benign findings" without providing some explanation for accepting the "remote in time" findings over those of Dr. Lindley.

### 4. Non-Examining Medical Consultants

A state agency medical consultant, Jerry Reed, M.D., completed a physical RFC assessment form on March 31, 2010. He reviewed the reports of Dr. Lamberty and

Dr. Lindley and concluded that Plaintiff's complaints are "less than fully credible" (Tr. 665). Dr. Reed's comments on the form were as follows:

> 46 y/o male, 5'7", 181 lbs. Alleges disability second to; Back Injury, possible brain tumor. Longitudinal mer [medical record] is quite sparse. A review of prior filings produced mer from 2007. Clmt apparently suffered an injury to mid thoracic spinal region in 2002. Clmt seen for CE [consultative examination] w/Dr Lamberty on 1/12/07. On exam, clmt complaining of back pain w/numbness and tingling in the LUE [left upper extremity] and weakness in his hands. Exam revealed that clmt appeared quite healthy but moved slowly. Tenderness noted over entire length of spine and at paraspinous muscles. ROM [range of motion] of spine WNL [within normal limits], extremities WNL, and neuro exam WNL. Clmt's symptoms noted to be out of proportion w/the objective evidence.
>
> Current CE conducted by David Lindley, MD on 3/2/10. On exam, clmt complaining of back pain, headaches, shooting pain down arms, legs, and feet, and tingling and weakness in hands. Exam revealed clmt having problems getting around the exam room w/cane. Vision WNL. Obvious muscle spasm noted in the thoracic and paralumbar muscles w/severe tenderness in the parathoracic muscles. ROM in elevation of arms above shoulder height SLR limited w/shooting pain down legs from clmt's back. Neuro intact XR's of the L-spine revealed loss of lumbar lordosis w/mild muscle spasm. Disc spaces well preserved, but significant abnormality identified at the L4 and L5 vertebral bodies w/some old vertebral body fx's. ROM of C-spine limited to 15° extension, 20° flexion, 10° L lat flexion, 30° lat flexion, and 20° bilat rotation. ROM of L-spine limited to 5° extension, 30° flexion, 10° L lat flexion, 15° R lat flexion, and 15° rotation bilat Dr. Lindley confirmed diagnoses of muscle spasm and OA [osteoarthritis] w/probably old injury. In L4 and L5, possible healed vertebral fx's, severe back pain, headaches, probably radiating from back pain, and neuropathic symptoms, variable, sometimes to the stage of even paralyzing clmt, preventing ambulation. Clmt noted to be an unsuitable candidate for surgery in the past.
>
> Claimant has an MDI [medically determinable impairment] of OA and muscle spasm at L-spine w/severe back pain that could reasonably produce the limitations alleged. Physicians' notes from AOD [alleged

onset date] to the present generally indicate physical findings partially supporting claimant's allegations. Claimant alleged in his ADL's [activities of daily living] that he can only walk 2-3 blocks on a bad day and 10-15 minutes on a good day, is able to stand for 15-30 minutes, and can sit for 2-3 hours. Clmt however alleges during CE that he can sit for only half an hour and can walk for about five minutes using a cane and then has to sit down due to increasing severe pain in his back. Overall, claimant's allegations and his ADL's are inconsistent with the longitudinal evidence therefore claimant's allegations are considered to be less than fully credible. Thus the overall pattern of evidence is partially consistent with W/E's allegations in that physical conditions are present, but is not consistent with any claim of marked physical limitations. Given claimant's condition, claimant would have difficulty lifting/carrying heavy objects in addition to the other limitations as outlined at this time in this RFC.

(Tr. 665).[14]

Dr. Reed opined on the form's checklist that Plaintiff can lift 20 pounds occasionally and 10 pounds frequently; that he can sit and stand for 6 hours each in an 8-hour workday; that he is not limited in the ability to push or pull; that he can occasionally climb, balance, stoop, kneel, crouch, and crawl; that his ability to reach in all directions is limited; and that he should avoid concentrated exposure to vibration and hazards such as machinery or heights (Tr. 659-662). This opinion matches the ALJ's subsequent assessment of Plaintiff's RFC.

Another state medical consultation, Glen Knosp, M.D., affirmed Dr. Reed's RFC assessment on August 6, 2010, stating:

The claimant is a 47 y/o male who alleges disability since 12/1/08 due to back injury. He does not report additional allegations at RECON.

---

[14] Significantly, Dr. Reed's comments give no indication that he reviewed Dr. Birney's treatment records or opinions. There is also no indication that he reviewed any reports concerning the 2002 x-rays and MRIs of Plaintiff's spine.

There is no additional evidence submitted at RECON. The claimant does have a history of mid thoracic spine injury in 2002. In 3/10, he was seen for CE and the imaging of spine shows disc spaces well preserved, but significant abnormality identified at the L4 and L5 vertebral lbodies [*sic*] w/some old vertebral body fractures. He has decreased ROM of spine. He used cane at CE but neurologically he was intact and there is no evidence this cane was prescribed.

This claimant does not M/E [medically equal] any listing. He is considered partially credible as severe limitations are not supported with objective MER in file. There is no evidence of change since prior RFC.

I have reviewed all of the evidence in file and the RFC of 3/31/10 is affirmed.

(Tr. 669)

The ALJ gave "significant weight" to the opinions of these non-examining physicians.[15]  In fact, the ALJ adopted their RFC assessments *in toto*.

In *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), the Eighth Circuit made clear that the opinions of a non-examining state agency medical consultants are not considered substantial evidence at step 5 of the sequential evaluation process.[16]  The court stated:

In the case at bar, there is no *medical* evidence about how Nevland's impairments affect his ability to function now. The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed

---

[15] Social Security regulations provide that "administrative law judges must consider findings and other opinions of State agency medical ... consultants ... as opinion evidence, except for the ultimate determination about whether [the claimant is] disabled." 20 CFR §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).

[16] "*Nevland* does not preclude the ALJ's reliance on a reviewing physician's report at step four when the burden is on the claimant to establish an inability to do past relevant work." *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007).

the reports of the treating physicians to form an opinion of Nevland's RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *Id*. In our opinion, the ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual functional capacity. As this Court said in *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975): "An administrative law judge may not draw upon his own inferences from medical reports. *See Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974); *Willem v. Richardson*, 490 F.2d 1247, 1248–49 n. 3 (8th Cir. 1974)."

*Id.* at 858 (emphasis in original); *see also Strongson v. Barnhart*, 361 F.3d 1066, 1071-72 (8th Cir. 2004) ("[T]he ALJ's duty to develop the record fully and fairly ... includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue."); *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008) ("If the ALJ does not find any of the medical opinions credible, then she should develop the record further to include medical evidence of a claimant's limitations.").

This case presents essentially the same situation as *Nevland*. The ALJ made an assessment of Plaintiff's RFC relying exclusively upon the opinions of state agency consultants who did not examine Plaintiff but instead reviewed the written results of examinations conducted by Dr. Lamberty in January 2007 and Dr. Lindley in March 2010. The ALJ discounted the opinions of both examining physicians because they only saw Plaintiff once and also discounted the opinion of Dr. Lamberty because his examination occurred almost 2 years before the alleged disability onset date. These criticisms apply equally to the opinions of the non-examining physicians, Dr. Reed and Dr. Knosp, who formed their opinions based entirely upon the results of the examinations that were conducted by Dr. Lamberty and Dr. Lindley. As discussed

-28-

above, Dr. Lindley is the only physician to examine Plaintiff during the relevant time period, and he did not provide an opinion about Plaintiff's functional limitations.

### C. Plaintiff's Credibility

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart,* 349 F.3d 549, 558 (8th Cir. 2003). To analyze a claimant's subjective complaints, the ALJ considers the entire record including the medical records, third party and the claimant's statements, and factors such as: 1) the claimant's daily activities; 2) the duration, frequency and intensity of pain; 3) dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and 5) functional restrictions. *See* 20 C.F.R. § 404.1529; *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)).

In this case, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally not fully credible" (Tr. 17). Plaintiff contests each of the reasons that were provided by the ALJ to support this credibility assessment.

The ALJ first stated that "[t]he claimant is able to engage in a wide range of activities of daily living that could translate into performing a job including household chores, such as sweeping, washing the dishes, feeding the dogs, and laundry" (Tr. 17).[17] This is an overstatement by the ALJ because Plaintiff testified he performs limited household chores and he did not admit to engaging in a "wide range" of

---

[17] "Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations." *Davis v. Apfel,* 239 F.3d 962, 966-67 (8th Cir. 2001). However, the Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Singh v. Apfel,* 222 F.3d 448, 453 (8th Cir. 2000).

activities.[18]   However, it is unclear from Eighth Circuit precedent whether the ALJ erred by finding Plaintiff's activities of daily living to be inconsistent with his complaints of pain. *Compare* McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (claimant with pain in back, neck, and pelvis was not unduly restricted in his daily activities, which included the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with the use of an electric cart) *with* Ford v. Astrue, 518 F.3d 979, 983 (8th Cir. 2008) (claimant's activities, which included washing a few dishes, ironing one or two pieces of clothing, making three or four meals each week, and reading, were not inconsistent with her complaints of shoulder and neck pain caused by degenerative disc disease, as well as pain in her hands, wrists, and arms caused by carpal tunnel syndrome); *see also* Clevenger v. Social Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009) ("Our cases admittedly send mixed signals about the significance of a claimant's daily activities in evaluating claims of disabling pain....").

---

[18] Plaintiff testified: "I usually wake up about 4:00 a.m., ... have a cup of coffee, smoke a cigarette, cope with some pain and then I get up and work around and try to do little chores as I can, try to sweep part of the floor or do what little dishes that need to be done because it's just my wife and I" (Tr. 41). "Feed the puppies in the morning ... right outside the door so I only have to take two steps" (Tr. 41). "I try to do as much as I can, you know, even though it hurts" (Tr. 41). "When I go to do the dishes at the house I can do about 10 or 15 items and then I've got to go sit down and relax for a half-hour doing it or then I can get up and finish a few more. It's just like everything I do. I get up and I can do it slowly, then I go back [to sitting in a chair]" (Tr. 38). "I try to do a load of laundry every other day if I'm able to get up and down the stairs.... I can sit and do folding" (Tr. 41). "[My wife] takes out the trash and sometimes I feel good enough to help her" (Tr. 41). "I walk down to the coffee shop ... about once a week, try to.... It's about six blocks" (Tr. 39-40). "I used to love playing guitar and I can get about 15 minutes of practice when I used to play three to four hours without even thinking" (Tr. 40). "[J]et skiing I can't do anymore, and golfing I can't do anymore. I don't even rake my yard or even do any yard work" (Tr. 40). "[R]eading gives me a headache" (Tr. 42).

Even assuming that the ALJ did err in this regard, such error is not cause for reversal unless the ALJ gave undue significance to Plaintiff's daily activities when making the credibility assessment. *See Cox v. Barnhart*, 471 F.3d 902, 908 (8th Cir. 2006) ("[E]ven if the ALJ had overestimated [the claimant's] capabilities, that would not have shown that his overall credibility decision was flawed because this was only one of the several inconsistencies he identified."); *see also Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (based on record as whole, credibility assessment was proper; ALJ may have overstated extent of daily activities, but record indicated claimant was generally able to care for himself).  Reviewing the ALJ's decision, it is evident that other factors weighed more heavily in the credibility assessment.

The ALJ declared that "[w]hile the medical record evidences that the claimant has degenerative disc disease/osteoarthritis, ... there are few objective findings and what objective evidence does exist is relatively benign (Exhibits 1F; 2F, pgs. 7-9; and 5F, pg. 53)" (Tr. 17-18). The exhibits referenced by the ALJ have been discussed above in connection with the ALJ's "step 2" finding:  Exhibit 1F (Tr. 377-379) and pages 7-9 of Exhibit 2F (Tr. 386-388) contain the radiologist's reports for the June 2002 MRIs of Plaintiff's thoracic and lumbar spine and the August 2002 MRI of Plaintiff's cervical spine; page 53 of Exhibit 5F (Tr. 579) is the radiologist's report for the June 2002 x-rays of Plaintiff's lumbar spine. The ALJ's description of the radiologist's reports as containing "relatively benign" findings is accurate, and this was a proper consideration. "Although an ALJ may not disregard a claimant's subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Gonzales*, 465 F.3d at 895 (internal quotations and alterations omitted) (quoting *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002)).

However, the ALJ did not reference Dr. Birney's reading of the cervical spine MRI results. Dr. Birney's findings indicated that Plaintiff's physical problems with degenerative disc disease were compounded by a narrowing of the spinal canal

between C3 and C6.  He believed this cervical stenosis "could be the cause of [Plaintiff's] current upper extremity complaints ... [and] numbness in both lower extremities" (Tr. 532).

In addition, the ALJ found that "the medical record indicates minimal treatment since [Plaintiff's] amended alleged onset date and gaps in treatment" (Tr. 18). The Eighth Circuit has consistently held that allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment. *See, e.g., Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [the plaintiff] would have sought regular medical treatment.").

Plaintiff claims he cannot afford to seek medical treatment, but, as noted by the ALJ, Plaintiff "testified that he smokes [costly] cigarettes" and there is no evidence that he "was ever refused treatment or medication for any reason," or that he "ever sought the aid ... to help defray the cost of treatment" (Tr. 18). These are all legitimate considerations. *See*, *e.g., Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) ("Although Riggins claims he could not afford such medication, there is no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking three packs of cigarettes a day to help finance pain medication."); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) ("[T]here is no evidence [the claimant] was ever denied medical treatment due to financial reasons."); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) ("[I]t was permissible for the ALJ to consider the lack of evidence that [the claimant] had sought out stronger pain treatment available to indigents.").

Plaintiff next complains about the ALJ's statement that "[w]hile the claimant testified that he uses a cane for balance, there is no indication in the medical record that it was prescribed" (Tr. 18). Again, this lack of supporting medical evidence was properly considered by the ALJ in assessing Plaintiff's subjective complaints. *See, e.g., Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) ("We also find no

medical records or opinions documenting [the claimant's] use of a cane as being medically necessary.").

Plaintiff also complains about the ALJ's observation that "the claimant was in no apparent distress at the hearing" (Tr. 18).  While it is true that the claimant's "failure to 'sit and squirm' with pain during the hearing cannot be dispositive of [his] credibility," *Muncy v. Apfel*, 247 F.3d 728, 736 (8th Cir. 2001), this does not mean that the ALJ is prohibited from considering a claimant's hearing behavior as part of the credibility analysis.  "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." *Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

The ALJ also noted Plaintiff's testimony "that he sits most of the day, which is his most comfortable position" (Tr. 18). Although Plaintiff complains the ALJ ignored his additional testimony that he would "get up and walk around every time it hurts[,] ... usually within a half-hour after sitting" (Tr. 43), "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). In any event, the ALJ stated earlier in his decision that Plaintiff "testified that he lies down two to three times a day to alleviate his pain, he has difficulties moving his legs, his legs tingle and have pressure, ... he uses a cane for balance, ... he can stand for 5-15 minutes, *walks every 30 minutes*, sits for half the day, and that sitting is his most comfortable position, but he could not work a 'desk job' because his back pain is too severe" (Tr. 16 (emphasis supplied)). The ALJ also stated that Plaintiff had previously reported that "he cooks, can drive for one and a half hours, sits and watches television, and *can sit for two to three hours at one time with breaks*, but is not able to do much due to pain (Exhibits 13E and 14E)" (Tr. 16 (emphasis supplied)).

Finally, Plaintiff objects to the ALJ's statement  that "the claimant's migraines, status-post kidney donation, mood disorder, and personality disorder were determined

-33-

to be non-severe" (Tr. 18 ) because this "step 2" determination is not inconsistent with Plaintiff's disability claim.  While the ALJ's statement does not provide a legitimate reason for discrediting Plaintiff's testimony, neither does it establish that the ALJ's credibility assessment is erroneous.   "[A]n arguable deficiency in opinion-writing technique does not require [the court] to set aside an administrative finding when that deficiency had no bearing on the outcome." *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) (quoting *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992)).

The ALJ noted that Plaintiff only claimed to be disabled because of "back injury and lumbar fractures (Exhibits 4E, pg. 1; 12E, pg. 2; and 24E)" (Tr. 16), but nonetheless made a finding at step 2 that "*a review of the medical record* reflects the impairments of migraines (Exhibits 6F, pg. 6 and l0F, pg. 5); status-post kidney donation (Exhibits 4F and 6F, pg. 6); mood disorder and personality disorder (Exhibits 9F, pg. 1 and 11F, pg. 4)" (Tr. 13-14 (emphasis supplied)). In further finding that Plaintiff's mental impairments caused "no degree of limitation" in activities of daily living and other functional areas, the ALJ also correctly noted that Plaintiff "*did not allege* [mood disorder or personality disorder] as a medical condition that impairs his ability to work at the hearing" (Tr. 14 (emphasis supplied)).  The ALJ made no finding that Plaintiff had exaggerated any of his symptoms associated with the non-severe impairments.

Overall, the ALJ has provided good reasons for his credibility findings.  *See, e.g., Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (ALJ properly considered that claimant's back pain responded to medical treatment and that he maintained activities of daily living with minimal accommodations).  The credibility assessment is flawed, however, insofar as the ALJ determined, without any discussion of Dr. Birney's diagnosis of cervical stenosis with myelopathy, that Plaintiff's subjective complaints are not fully supported by objective medical evidence.

-34-

### D. Residual Functional Capacity

"'Residual functional capacity' [('RFC')] is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities. . .. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (internal quotations and citations omitted).

"In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." Social Security Ruling 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996).

The ALJ's assessment of Plaintiff's RFC supports his "step 4" finding that Plaintiff is unable to perform any past relevant work, but, for reasons already explained above, it does not suffice to prove that Plaintiff can perform other jobs in the national economy. *See Nevland*, 204 F.3d at 858. On remand, the Commissioner should obtain a medical opinion concerning the extent of Plaintiff's functional capacity since December 1, 2008.

### E. "Step Five" Determination

"[T]he testimony of a vocational expert who responds to a hypothetical based on [the opinions of doctors who have not examined the claimant] is not substantial evidence upon which to base a denial of benefits. *Id.* (citing *Jenkins*, 196 F.3d at 925). Because the ALJ in this case only credited the opinions of non-examining physicians in assessing Plaintiff's RFC, the vocational evidence does not establish that Plaintiff is able to work.[19]

_____

[19]The Commissioner concedes that the VE's answer to the ALJ's hypothetical was partially incorrect. According to the Dictionary of Occupational Titles, two of the jobs that were identified by the VE as being suitable for a person with Plaintiff's limitations—charge account clerk and order clerk—require "frequent" reaching. The ALJ's hypothetical question permitted only "occasional" reaching. "An ALJ cannot rely on expert testimony that conflicts with the job classifications in the Dictionary of Occupational Titles unless there is evidence in the record to rebut those classifications." *Jones v. Astrue*, 619 F.3d 963, 978 (8th Cir. 2010) (internal quotations and alterations omitted) (quoting *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003)). This error was harmless, however, because the VE identified a third job—surveillance system monitor—which requires only "occasional" reaching. The job numbers that were provided by the vocational expert for such work (*i.e.*, 500 jobs available in Nebraska and 79,280 jobs available nationally) are within the range that the Eighth Circuit has considered "significant." *See Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003) (citing cases); *Weiler v. Apfel*, 179 F.3d 1107, 1111 (8th Cir. 1999) (32,000 surveillance monitor positions nationwide was significant number).

## IV. CONCLUSION

For the reasons explained above, I find the ALJ's decision is not supported by substantial evidence on the record as a whole.  The decision will be reversed and the case remanded for a new RFC assessment and "step 5" determination. Accordingly,

IT IS ORDERED that the decision of the Commissioner is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and the case is remanded for further proceedings consistent with the foregoing opinion.  Final judgment will be entered by separate document.

January 16, 2014.                     BY THE COURT:

                                      *Richard G. Kopf*
                                      Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.